IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States,  Case No. 3:04CR786

      Plaintiff

    v.  ORDER

Mohammad Anvari-Hamedani,

      Defendant

This is a criminal case in which the government has charged an Iranian-American doctor with various offenses relating to his transfer of money and equipment to Iran.

Pending are the defendant's motions to dismiss. For the following reasons, defendant's motions shall be denied.

## Introduction

The defendant, Mohammed Anvari-Hamedani, is a doctor of Iranian descent practicing in Fostoria, Ohio. The indictment alleges that during the period May, 2001 - March, 2002, the defendant engaged in a series of transactions involving unlawful transfers of approximately $4 million in funds and equipment to Iran.

The indictment alleges that, as to some of the funds, the defendant directed Merrill Lynch to transfer funds from his account with that firm to intermediary banks in Dubai, United Arab Emirates (U.A.E.) and Hong Kong. Those funds were then allegedly forwarded to a bank in Iran.

Other transfers allegedly were made directly to Iran from foreign bank accounts held by the defendant. In addition, the defendant is asserted to have caused transfers of certificates of deposit totaling

approximately 1.8 million British pounds to Iran.

The indictment further alleges that the defendant also engaged in "Hawala" transfers of funds. Hawala transfers, as described in the indictment, do not involve physical or electronic transfers of funds. Such transfers, the government charges, involve payment of monies to a "hawaladar" in this country. The recipient of those funds arranges, in turn, for funds located in another country to be paid to a designated recipient.

In addition to causing the transfer of funds, the defendant, the indictment charges, caused water purifying equipment and diesel engine parts to be shipped to Iran.

After some of those acts came to the government's attention following the filing by Merrill Lynch of a Suspicious Financial Activity Report, the government began the investigation leading to the indictment. As returned by the grand jury, the indictment charges the defendant with violating presidential directives issued under the International Emergency Economic Powers Act (IEEPA)[1] and federal money laundering laws.

The defendant moves to dismiss the indictment. He claims the indictment must be dismissed because, according to him: 1) the presidential regulations adopted under IEEPA violate the non-delegation doctrine, which limits the ability of Congress to delegate legislative authority to the Executive; 2) the IEEPA regulations are void-for-vagueness, because they cannot be understood by a person of common intelligence, and thus do not give adequate notice of the conduct that might expose one to charge and

---

[1] As discussed in greater detail below, the IEEPA had its origins in the Trading With the Enemy Act of 1917, 40 Stat. 411, as amended, 50 U.S.C. app. § 5(b). The statute gives the President broad authority, *inter alia*, to prohibit transfers of funds and property to countries found by the President to present a threat to the national security of the United States.

conviction; and 3) the indictment is multiplicitous, in that it charges separate crimes for conduct constituting only a single offense, thus exposing the defendant to being convicted twice for the same acts in violation of the double jeopardy clause.

For the reasons that follow, the motion to dismiss shall be overruled. I conclude that the regulations at issue neither contravene the non-delegation doctrine nor are impermissibly vague. I also conclude that the indictment charges separate crimes for the defendant's alleged acts, so that conviction of the defendant would not violate the double jeopardy clause of the Fifth Amendment. In addition, I find that defendant's selective prosecution claim fails because he has not shown that his prosecution serves a discriminatory effect and has a discriminatory intent.

## Discussion

Defendant has moved to dismiss the IEEPA and money laundering charges because: 1) criminalization of the defendant's conduct under the IEEPA violates the non-delegation doctrine; 2) the regulatory scheme implemented under the IEEPA is void for vagueness; 3) the money laundering counts are multiplicitious; and 4) the defendant has been subjected to selective prosecution.

### 1. IEEPA

The IEEPA is an outgrowth of the Trading With the Enemy Act of 1917 (TWEA), 40 Stat. 411, as amended, 50 U.S.C. app. § 5(b), a statute which grants the Executive Branch broad authority. *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981). The IEEPA grants the President power, through "regulations . . . instructions, licenses, or otherwise" to:

(A) investigate, regulate, or prohibit–

(i) any transactions in foreign exchange,

> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>
> (iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . .

50 U.S.C. § 1702.

Congress limited the President's power to act under this section "to deal with any unusual and extraordinary threat" in times of declared "national emergency." 50 U.S.C. § 1701.[2] The statute also provides that: "[w]hoever willfully violates, or willfully attempts to violate, any license, order, or regulation

---

[2] Section 1701 states:

> (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.
>
> (b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

issued under this chapter shall . . . be fined not more than $50,000, or . . . may be imprisoned for not more than ten years, or both . . . ." 50 U.S.C. § 1705.

Presidents have invoked their authority under the IEEPA to impose a variety of sanctions against foreign countries, including Iran. *See, e.g.*, Exec. Order No. 12735, 55 Fed. Reg. 48587; (order issued by President Bush on November 16, 1990, declaring a national emergency with respect to the threat to national security imposed by the proliferation of chemical and biological weapons);
Exec. Order No. 12170, 3 C.F.R. 457 (1980) (order issued by President Carter declaring a national emergency on November 14, 1979, and blocking the removal or transfer of "all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States . . . ."). At issue in this case are Executive Orders issued by President Clinton, Nos. 12957, 12959, and 13059.[3]

Executive Order 13059 prohibits "any new investment by a United States person in Iran or in property, including entities, owned or controlled by the Government of Iran . . . ." Exec. Order No. 13059 § 2(c), 31 C.F.R. 560.207. The term "investment" is broadly defined as "a commitment or contribution of funds or other assets" or "a loan or other extension of credit, made after the effective date of Executive Order 12957 as to transactions prohibited by that order, or otherwise made after the effective date of Executive Order 12959." Exec. Order No. 13059 § 4(f), 31 C.F.R. 560.316.

---

[3] Executive Order 13059, § 7 consolidated the provisions of Executive Orders 12957 and 12959. The language of Executive Order 12959, with respect to the prohibition against new investments is identical to the language of Executive Order 13059. Executive Order 12957 applies to transactions relating to Iran's petroleum resources, and therefore, despite its inclusion in the indictment, is not at issue in this case.

**A. Non-Delegation Doctrine**

Defendant contends that the IEEPA violates the non-delegation doctrine because the congressional delegation of authority to the Executive Branch to take emergency action under the IEEPA lacks an adequate "intelligible principle" to constrain Executive Branch authority. Section 1705(b) delegates legislative authority to the Executive Branch to criminalize "willful" violations of orders or regulations, and thus, defendant argues the IEEPA is an unlawful "delegation to the President to criminalize previously lawful conduct." (Doc. 25 at 2.)

In the alternative, defendant argues, even if this court finds an intelligible principle, that the executive branch exceeded its authority in Executive Orders 12959 and 13059 by defining "new investment" in such a manner as to criminalize "the mere transfer of funds." (Doc. 25 at 6.)

The non-delegation doctrine is based in Article I, § 1, of the Constitution, which vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." Generally, our system of government does not permit a delegation of those powers. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citing *Loving v. United States*, 517 U.S. 748, 771 (1996)).

The Supreme Court has recognized, however, that the separation-of-powers principle and the nondelegation doctrine do not prevent Congress from obtaining assistance from its coordinate branches of government where Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989) (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The Supreme Court's jurisprudence in this area has largely "been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical

problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* (citations omitted). Accordingly, the Court has upheld the delegation of legislative authority so long as "Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372-73 (citing *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

The Supreme Court has found the requisite intelligible principle lacking in only two statutes: "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring fair competition." *Whitman*, 531 U.S. at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

As to this record, the Supreme Court has commented: " we have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Id.* (quoting *Mistretta* , 488 U.S. at 416 (Scalia, J., dissenting); *see id.*, at 373 (majority opinion)).

In the context of the IEEPA, the Supreme Court has upheld Congress's delegation to the President of civil authority to nullify certain attachments and transfers of assets. *See Dames & Moore*, 453 U.S. at 675. The issue of delegation of authority to define criminal conduct, however, is more complex and has not been addressed by the Supreme Court.

The Fourth Circuit, however, has addressed the delegation of power to define criminal conduct under the IEEPA in *U.S. v. Arch Trading Co.*, 987 F.2d 1087, 1093 -94 (4th Cir. 1993). Relying on Supreme Court precedent in *Touby v. United States*, 500 U.S. 160, 165-66 (1991), which upheld the

7

delegation of authority to the Attorney General to specify controlled substances, the possession of which violates criminal law, the Fourth Circuit held that the IEEPA, like the statute at issue in *Touby*, meaningfully constrain[ed] the President's discretion to define criminal conduct. *Id.*[4]

In *Touby*, the Court discussed Congress's restrictions on the Attorney General's power which included: 1) restricting the Attorney General's power to schedule a substance only after it was determined to be "necessary to avoid an imminent hazard to the public safety"; 2) specifying the factors to use in such a determination; 3) requiring a published thirty-day notice of the proposed scheduling in the Federal Register and consideration of any comments from the Secretary of Health and Human Services; and 4) requiring certain findings be made as to the effects of the substance. *Id.* at 166-67.

The Fourth Circuit found similar restrictions in the IEEPA:

The IEEPA, which was drawn from and constitutes an extension to the Trading with the

---

[4]

The Fourth Circuit relied heavily on the Supreme Court's analysis in *Touby* of Congress's delegation of authority to the Attorney General to define criminal conduct under the Controlled Substances Act (CSA), 21 U.S.C. § 811(h). *See Arch Trading Co.*, 987 F.2d at 1093. In *Touby*, the Supreme Court determined that even if Congress was required to provide more guidance when authorizing another branch to define criminal conduct, the CSA's delegation met that standard:

> [O]ne cannot plausibly argue that § 201(h)'s 'imminent hazard to the public safety' standard [for listing controlled substances] is not an intelligible principle.
>
> Petitioners suggest, however, that something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions. They contend that regulations of this sort pose a heightened risk to individual liberty and that Congress must therefore provide more specific guidance. Our cases are not entirely clear as to whether more specific guidance is in fact required. . . . We need not resolve the issue today. We conclude that § 201(h) passes muster even if greater congressional specificity is required in the criminal context.

*Touby*, 500 U.S. at 165-66.

> Enemy Act of 1917, 50 U.S.C.App. § 1, et seq., defines the specific circumstances in which the President may act and to what extent. The President's authority is limited to meeting a foreign threat "to the national security, foreign policy or economy of the United States," that is "unusual and extraordinary," and only then if he is able to declare the threat a "national emergency" under the National Emergencies Act, 50 U.S.C. § 1601, et seq. See 50 U.S.C. § 1701. He is required to consult with Congress before, if possible, exercising the powers conferred, to explain his acts in specified respects, and to report regularly thereafter during the period of the emergency. *See* 50 U.S.C. § 1703. The powers granted to the President are explicitly defined and circumscribed. *See* 50 U.S.C. § 1702. Moreover, the Act protects the conduct of any person whose violation of the President's order can be shown to be "in good faith." 50 U.S.C. § 1702(a)(3).

*Id*. at 1093.

The Fourth Circuit also noted the presence of two additional factors which support Congress's grant of authority to the President in the IEEPA: 1) the President's powers to make determinations regarding foreign policy;[5] and 2) Congressional authorization and acceptance of the President's actions.[6]

*Id*. at 1094.

---

[5] *See generally Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (citations omitted) ("The Court also has recognized the generally accepted view that foreign policy was the province and responsibility of the Executive. . . .[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Tachiona v. U.S.*, 386 F.3d 205, 212 (2d Cir. 2004) (stating that "the power to conduct foreign affairs is vested principally in the executive branch."); *U.S. v. Smith*, 899 F.2d 564, 569 (6th Cir. 1990) (noting the "broad authority of the Executive Branch to exercise its discretion in matters that touch national security and foreign affairs").

[6] *Dames & Moore*, 453 U.S. at 668 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ("When the President acts pursuant to an express or implied authorization from Congress, . . . the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'")); *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 313 (1933) ("Acquiescence by Congress in an administrative practice may be an inference from silence during a period of years.).

I find the Fourth Circuit's analysis persuasive. The restrictions set forth by Congress in the IEEPA, the President's traditional province powers over foreign affairs, and Congress's acceptance of the President's actions persuade me that Congress has provided the President with an intelligible principle sufficient to pass muster under the non-delegation doctrine and has limited the President's authority to define criminal conduct in compliance with the standard in *Touby*.

### B. Void for Vagueness

Defendant moves to dismiss Counts 1–19, 22, and 23 from his indictment claiming that 18 U.S.C. § 1705 and supporting executive orders and regulations are unconstitutionally vague.

A statute is unconstitutionally vague and due process is violated when a person of common intelligence must guess at the meaning of a law. *United States v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). *See also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("living under a rule of law entails various suppositions, one of which is that '(all persons) are entitled to be informed as to what the State commands or forbids.'" (*quoting Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). Further, a statute need only provide "'fair warning of the nature of the proscribed conduct'" in order to survive a vagueness challenge. *United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002) (quoting *Rowan v. U. S. Post Office Dep't*, 397 U.S. 728, 740 (1970)) (citation omitted).

When a law restricts constitutionally protected actions, like freedom of speech or association, then a stricter vagueness test applies. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (citations omittted). Because defendant does not allege that his actions are constitutionally protected, a less onerous test applies.

10

It is true that vagueness may invalidate a statute if it either: 1) fails to provide notice such that an ordinary person would understand what the statue prohibits; or 2) allows "arbitrary and discriminatory" prosecution. *Caseer*, 399 F.3d at 836 (citing *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). However, "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). "As a practical matter, the Supreme Court considers [a statute's instruction to law enforcement] the more important. This reflects the common understanding that the average citizen does not read, at his leisure, every federal, state, and local statute to which he is subject." *Caseer*, 399 F. 3d at 836 (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995)).

If the underlying statute includes a scienter requirement, as does 50 U.S.C. § 1705(b),[7] then it "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.*; *see also United States v. Ragen*, 614 U.S. 513, 524 (1942) ( "A mind intent on willful evasion is inconsistent with surprised innocence." ); *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986) ("[A] requirement of willfulness makes a vagueness challenge especially difficult to sustain.").

While § 1705(b) does not expressly state the proscribed conduct, it instructs the reader that certain

---

[7] 50 U.S.C. § 1705 states, in pertinent part: "(b) Whoever *willfully* violates, or *willfully attempts* to violate, any license, order, or regulation issued under this title [50 USC §§ 1701 et seq.] shall, upon conviction, be fined not more that $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both. . .." (Emphasis added).

11

conduct is proscribed and, if the actor willfully violates the conduct, then they are subject to prosecution. Section 1705(b), therefore, tells the reader to look elsewhere, not an onerous burden. The primary inquiry in a vagueness challenge is whether law enforcement is adequately directed as to what conduct is proscribed, *Caseer*, *supra*. Because § 1705(b) directs the reader — i.e. law enforcement — to look elsewhere for clarification, it meets this burden.

Likewise, Executive Order 13059 directs what conduct is proscribed. The order prohibits any United States person from investing in Iran, the term "investment" being defined very broadly. Arguably, 31 C.F.R. §§ 560.210, 560.516 limit this Executive Order, as they allow transfers for humanitarian purposes and to family in Iran.

Defendant claims that his conduct was not actually proscribed as he was sending aid to family and for the humanitarian purpose of building a conference center at Shahed University. Defendant claims that, because his conduct was allowed by regulation, the statute proscribing his conduct must be constitutionally vague.

The prosecution *ipso facto* agrees that, if defendant was transferring funds for humanitarian purposes or to family, that he would not be in violation of § 1705(b). However, the prosecution says that they are prepared to prove that defendant was not actually transferring funds for humanitarian purposes or to family, but was creating "new investments" in Iran in contravention of § 1705(b) and the corresponding Executive Order. Therefore, defendant's claim that his conduct was allowed properly is a trial defense, not a rationale why the law is vague.

I find that, combined with the "willfulness" requirement in § 1705(b), the President's order, enacted pursuant to that section, is not unconstitutionally vague. The order points law enforcement towards what

is proscribed and gives the reasonable reader information about what conduct is illegal. As the proscribed conduct is not in the nature of a constitutional right, and the statue and the corresponding Executive Order give fair warning about the nature of the proscribed conduct, defendant's vagueness challenge cannot succeed.

## 2. Multiplicity

Defendant seeks an order dismissing Counts 24-31 of the indictment which allege money laundering in eight separate transfers of funds in violation of 18 U.S.C. § 1956(a)(2)(A). Defendant contends that these same eight transfers of funds also serve as the basis for the charges in Counts 1-8, violations of the IEEPA. The money laundering charges are multiplicitous and violate the Double Jeopardy Clause, defendant argues, because he "is being put at risk of conviction for two felonies for the same funds in the same transaction." (Doc. 23 at 5.)

The rule against multiplicity provides that an indictment may not charge a single criminal offense in several counts. *United States v. Hart*, 70 F.3d 854, 859 (6th Cir. 1995) (citing *United States v. Busacca*, 936 F.2d 232, 239 (6th Cir. 1991)). The rule derives from the Fifth Amendment's double jeopardy clause, which "protects against three harms: second prosecution for an offense after initial acquittal, second prosecution for an offense after an initial conviction, and 'multiple punishments for the same offense.'" *United States v. Gibbons*, 994 F.2d 299, 301 (6th Cir. 1993) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). In a multiplicitous indictment, the potential harm is that a defendant will receive multiple sentences for a single offense.

"The general test for compliance with the double jeopardy clause looks to 'whether each provision requires proof of a fact which the other does not.'" *Id.* (citing *Blockburger v. United States*, 284 U.S.

299, 304 (1932)).

Plaintiff has been charged with violating the IEEPA, 50 U.S.C. 1702, 1705, and money laundering, 18 U.S.C. § 1956(a)(2)(A)(2).

As previously stated, the IEEPA grants the President power to "prohibit" transfers or transactions involving foreign countries in times of declared "national emergency." 50 U.S.C. § 1701; 50 U.S.C. § 1702. Pursuant to his authority under these sections, President Clinton signed Executive Order 13059 prohibiting new investments in Iran. The IEEPA also establishes a fine and/or imprisonment for those convicted of "willful" violations or attempted violations of orders issued under the statute. 50 U.S.C. § 1705(b).

> The prohibition against international money laundering states:
>
> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--
>
> (A) with the intent to promote the carrying on of specified unlawful activity; or . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. . . .

18 U.S.C. § 1956(a)(2). Congress defined the term "specified unlawful activity" to include "an offense under . . . section 206 (relating to penalties) of the International Emergency Economic Powers Act." 18 U.S.C. § 1956(c)(7)(D).

Based on the language of the statute, the IEEPA violation requires proof that: 1) a U.S. person; 2) willfully or willfully attempted; 3) to commit funds or other assets; 4) to Iran. The international money

14

laundering charge requires proof of: 1) a transfer of or an attempt to transfer funds; 2) from a place in the United States; 3) to or through a place outside the United States; 4) with the intent to promote the carrying on of specified unlawful activity.

Under the *Blockburger* test, the two offenses require proof of a fact which the other does not. The IEEPA offense requires proof that the defendant acted "willfully" when he contributed funds to Iran, 50 U.S.C. § 1705(b), whereas the international money laundering offense requires proof that the defendant acted with the intent to promote a "specified unlawful activity." 18 U.S.C. § 1956(a)(2). While this distinction between the two offenses may be thin, it is nonetheless sustainable.

The language of the international money laundering statute also supports the decision that the two charges are not multiplicitous. Congress contemplated that an individual could be charged with a violation of the IEEPA and money laundering when it specifically identified an offense under the IEEPA as a "specified unlawful activity." *See generally U.S. v. Piervinanzi*, 23 F.3d 670, 677, 679-80 (2d Cir. 1994) (holding that defendants' act of attempting to fraudulently transfer funds out of certain banks (i.e., bank fraud, 18 U.S.C. § 1344) was analytically distinct from the attempted transmission of those funds overseas (i.e., money laundering, 18 U.S.C. § 1956(a)(2); the two actions are independently illegal and was itself independently illegal and do not merge).

Alternatively, the government argues that defendant "has erroneously conflated . . . multiple financial transactions into one" by arguing that his investment of funds in Iran amounts to "a single monetary transaction." (Doc. 29 at 17; Doc. 23 at 4.) The government contends that defendant "undertook a two-step process" in investing in Iran. (Doc. 29 at 17.) I also find this argument, from a factual perspective, to be persuasive.

The defendant first transferred funds from his Merrill Lynch account in the United States to accounts in the U.A.E. and Hong Kong. The transfers of funds from the U.S. to the intermediary banks serve as the basis for the government's charge of money laundering; it alleges that the defendant made these first transfers for the purpose of promoting a violation of the IEEPA. The subsequent transfers of funds from the U.A.E. and Hong Kong to Iran serve as the basis for the IEEPA violations.

### 3. Selective Prosecution

Defendant moves to dismiss the indictment against him claiming that he was selectively prosecuted. In the alternative, defendant moves for an order allowing more discovery so that he may bolster this claim.

To prevail on a selective prosecution claim, a defendant must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent. *United States v. Jones*, 399 F.3d 640, 645 (6th Cir. 2005) (quoting *United States v. Jones*, 159 F.3d 969, 976–77 (6th Cir. 1998) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996))).

The standard for a defendant to prevail on a claim of selective prosecution is a demanding one. *Armstrong*, 517 U.S. at 463. Ordinarily, "'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.'" *Id*. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). To "dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Id*. at 465 (quoting *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926)).

To establish discriminatory effect, the defendant must demonstrate that similarly situated individuals of a different race, religion, and ethnicity were not prosecuted. *Armstrong*, 517 U.S. 465. To establish

16

discriminatory intent where, as in this case, defendant suggests he was discriminated against because he is a Muslim and Iranian-American, defendant must show that the prosecutorial policy was motivated by animus towards Muslims and Iranian-Americans. *Jones*, 399 F.3d at 645.

The IEEPA violation of which defendant is accused is the transferring of funds to Iran. Defendant claims that Merrill Lynch transferred funds to Iran or, in the alternative, Merrill Lynch knew that the money was being transferred to Iran. There is no evidence, however, that Merrill Lynch transferred funds to Iran, even though they transferred funds to a branch of an Iranian bank located outside of Iran. In fact, the indictment only alleges that defendant caused Merrill Lynch to transfer funds from Toledo, Ohio to accounts in Dubai, U.A.E. and Hong Kong. It is from those locations that funds were transferred into Iran. There is sufficient evidence to indicate that, after Merrill Lynch found out why defendant was transferring funds to these locations, Merrill Lynch refused to complete any more transfers.

Defendant, furthermore, allegedly ordered the funds transferred, whereas Merrill Lynch simply followed the directions of its customer. Defendant allegedly caused the funds to actually go to Iran, whereas Merrill Lynch only caused the funds to go to banks located outside of Iran. Finally, defendant is an individual, whereas Merrill Lynch is a financial institution. Therefore, Merrill Lynch is not "similarly situated" to defendant.

Defendant also points to allegedly disparate treatment between himself and an American company, Clearwater Enviro Technologies. Clearwater exported approximately $40,000 worth of goods to Iran. However, as discussed *supra*, willfulness is an element of the charged offense. The government contends that it cannot prove that Clearwater acted willfully, while the government contends that it will present sufficient evidence to show that defendant acted willfully.

17

It may be arguable that Clearwater is not "similarly situated." Nonetheless, the government may properly exercise its discretion to refrain from prosecuting such similarly situated party on the basis that conviction would be unlikely.

Defendant also seeks to raise an inference of discrimination from the fact that pictures of Iranian clerics were seized during execution of a search warrant on his house, but a picture of President and Mrs. Reagan was not seized. The short answer to that contention is that the photos of the clerics could possibly be proof of motive,[8] whereas the photo of the Reagans would prove nothing for the prosecution.

As defendant has not shown that his prosecution both serves a discriminatory effect and has a discriminatory intent, defendant's motion to dismiss the indictment fails.

In the alternative, defendant asks this court to order further discovery. The United States Attorney's Office in Toledo has an open-file discovery policy. I fail to see how ordering further discovery will allow the defendant to show that his prosecution is discriminatory. Therefore, defendant's alternative motion to compel discovery, likewise, shall be denied.

### Conclusion

In light of the foregoing, it is

ORDERED THAT Defendant's motions to dismiss be, and the same hereby are, denied. A scheduling conference is set for August 22, 2005 at 9:45 a.m. Time deemed excludable in the interest of justice.

So ordered.

---

[8] I will delay any ruling on the admissibility of these pictures for a later date.

/s/James G. Carr
James G. Carr
Chief Judge

19